UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES, AFL-CIO, </br></br>　　　　　Petitioner, </br>　　v. </br></br>PROJECT VERITAS ACTION FUND, et al., </br></br>　　　　　Respondents. | Miscellaneous No. 21-0133 (PLF) </br> Related Case: Civil Action No. 17-1047 |

OPINION

On July 8, 2022, petitioner the American Federation of State, County and Municipal Employees, AFL-CIO ("AFSCME") filed a motion to quash subpoenas for trial testimony of AFSCME President Lee Saunders and AFSCME Chief of Staff and Counsel William Lurye. See Non-Party Motion to Quash Subpoenas for Trial Testimony of AFSCME President Lee Saunders and Chief of Staff/Counsel William Lurye ("Pet'r Mot.") [Dkt. No. 6]. Both have been subpoenaed to testify at trial by respondents Project Veritas Action Fund, et al. ("Project Veritas") in the case of Democracy Partners v. Project Veritas Action Fund, Civ. No. 17-1047. Id. at 2.

AFSCME argues that the subpoenas are "harassing" and unduly burdensome. See Pet'r Mot. at 2. Project Veritas opposes the motion, maintaining that Mr. Saunders and Mr. Lurye have valuable testimony to offer and that the subpoenas are not harassing and do not impose an undue burden on the individuals or on AFSCME. See Project Veritas Parties' Response to Non-Party Motion to Quash Subpoenas for Trial Testimony of AFSCME President

Lee Saunders and Chief of Staff/Counsel William Lurye ("Resp't Opp.") [Dkt. No. 7] at 8. For the following reasons, the Court entered an Order on August 21, 2022 quashing the subpoena for the testimony of Lee Saunders and enforcing the subpoena for the trial testimony of William Lurye. See Minute Order (Aug. 21, 2022).

## I. BACKGROUND

### A. AFSCME and AUFC

AFSCME is a national labor union of public service employees, comprised of approximately 1.4 million members across the United States. See Pet'r Mot. at 4. Lee Saunders is the elected President of AFSCME, and William Lurye is the Chief of Staff and Counsel. Id. In 2016, AFSCME had a contract with Strategic Consulting Group, NA, Inc. ("Strategic Consulting"), a political consulting firm that "provides campaign-related services to progressive organizations and Democratic campaigns and committees." Democracy Partners, LLC. v. Project Veritas ("Democracy Partners III"), 453 F. Supp. 3d 261, 267 (D.D.C. 2020). Under the contract, Strategic Consulting provided "patch-through calls" for AFSCME – "automated calls that aim to have the recipient contact an elected official (often a member of Congress) and offer to patch the recipient through to the official's office." Resp't Opp. at 4; see also Democracy Partners III, 453 F. Supp. 3d at 276. Strategic Consulting was a corporate member of Democracy Partners, LLC, "a limited liability company to which a number of companies and sole proprietorships belong as members." Democracy Partners III, 453 F. Supp. 3d at 267.[1]

---

[1] Democracy Partners has a unique membership structure. "The members include a number of consultants and vendors to progressive organizations and Democratic campaigns and committees. Democracy Partners itself does not have employees, but it serves as a common marketing vehicle for its members, in which capacity it retains various consultants to serve the members' common interests. Membership is governed by a formal operating agreement, and members contribute to cover some of the shared costs through modest annual dues or in-kind services." Democracy Partners III, 453 F. Supp. 3d at 267 (internal citations omitted).

AFSCME also had a contract with Americans United for Change ("AUFC"), a progressive advocacy organization that operated out of the same office as Strategic Consulting and Democracy Partners ("Suite 250"). See Democracy Partners III, 453 F. Supp. 3d at 267. AFSCME was AUFC's principal funder. Id. at 268. AUFC had close ties with the plaintiffs in the underlying litigation, Democracy Partners and Strategic Consulting; it held the lease for Suite 250 and was also a client of Strategic Consulting. See id. ("[AUFC] had an oral contract with Strategic Consulting to pay it $11,000 per month for consulting services, and it paid an additional amount for automated telephone calls and other specific services.").

### B. *Democracy Partners v. Project Veritas*

The subpoenas in this action arise out of litigation related to an undercover operation conducted in 2016 by Project Veritas to infiltrate the Washington, D.C. office of Democracy Partners and Strategic Consulting. See Democracy Partners III, 453 F. Supp. 3d at 266-67; see also Democracy Partners, LLC. v. Project Veritas ("Democracy Partners VII"), 2022 WL 3334689 (D.D.C. Aug. 12, 2022). An employee of Project Veritas, Allison Maass, used a false identity to obtain an unpaid internship with Democracy Partners, and then "secretly recorded everything she saw and heard during her internship." Democracy Partners III, 453 F. Supp. 3d at 271 (emphasis in original). Project Veritas gained access to confidential information regarding work that Democracy Partners was doing on behalf of the Democratic National Committee ("DNC") related to the 2016 Presidential election. Id. at 267. Project Veritas used the recordings, along with other materials, in a four-part series it published on YouTube entitled "Rigging the Election." Id.

In 2017, Democracy Partners; Robert Creamer, its president; and Strategic Consulting filed a lawsuit against Project Veritas; Project Veritas Action Fund; James O'Keefe,

3

the founder and president of both Project Veritas organizations; and Ms. Maass. See Democracy Partners III, 453 F. Supp. 3d at 268. Plaintiffs in this lawsuit claim damages based on "the loss of Strategic Consulting's contract with AFSCME (lost income to Strategic Consulting of $546,765)" and "the loss of Strategic Consulting's contract with AUFC (lost income to Strategic Consulting of $567,408)." Id. at 274.[2] To avoid "raising any First Amendment concerns," Judge Huvelle ruled that plaintiffs may only recover damages if "defendants' non-expressive conduct was a substantial factor in the decisions by AFSCME and AUFC to terminate their contracts with Strategic Consulting." Id. at 275. Plaintiffs therefore must prove at trial that AFSCME and AUFC did not cancel their contracts with Strategic Consulting due solely to the content of "Rigging the Election." See id. Instead, plaintiffs will seek to persuade the jury that the publication of "Rigging the Election" revealed that "'the confidential information and documents of [their] clients had been stolen, compromised and publicly disseminated as a result of defendants' action' and that this 'public exposure caused the Plaintiffs to be viewed by certain clients as not capable of maintaining the confidentiality of sensitive and confidential client information.'" Id. at 274 (quoting plaintiffs' interrogatory responses).

During the course of discovery in the underlying litigation, defendants served AFSCME with a subpoena for the production of documents and for deposition testimony. See Pet'r Mot. at 3; Resp't Opp. at 5. AFSCME produced the requested documents and designated Scott Frey, its former director of government affairs, to testify on its behalf at a deposition pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure. See Pet'r Mot. at 3. Mr. Frey

---

[2] Judge Huvelle's summary judgment opinion recognized that "the most direct cause of [AUFC's decision to stop doing business with Strategic Consulting] was AFSCME's decision to stop funding AUFC, a decision that was made at the same time that AFSCME canceled its contract with Strategic Consulting and, according to plaintiffs, for the same reasons." Democracy Partners III, 453 F. Supp. 3d at 276.

4

was deposed on November 27, 2018.  See Videotape Deposition of Scott Frey, November 27, 2018 ("Frey Dep.") [excerpts submitted at Dkt. Nos. 6-3, 7-2, and 8-1].  Mr. Frey "testified that he, together with Lurye, made the decision to cancel AFSCME's business arrangements with the relevant Plaintiffs."  Pet'r Mot. at 3; see also Frey Dep. At 75:1-7 ("[Q.] Whose decision was it to terminate the contract and relationship with Bob Creamer's Strategic Consulting Group and Democracy Partners?  A. I went up to discuss this, as I said, with the chief of staff . . . and we just mutually agreed that we should end the relationship.").  Mr. Frey further testified that the decision to terminate the contract "would be a recommendation to the president, [Mr. Saunders,] which [Mr. Frey and Mr. Lurye] felt he would not disagree with."  Frey Dep. at 75:12-14.  He also stated that "[s]ubsequent to that decision . . . he had a 'pretty short conversation' with the President in which the President expressed concern that Brad Woodhouse from AUFC had not called him directly about the video."  Pet'r Mot. at 8 (citing Frey Dep. at 74:8-20).

Scott Frey has been listed as a fact witness by both parties to testify at trial in the underlying action, which is scheduled to begin on September 13, 2022.  See Joint Pretrial Statement ("JPS"), Democracy Partners v. Project Veritas, Civ. No. 17-1047 [Dkt. No. 138] at 13, 16.  On June 22, 2022, Mr. Saunders and Mr. Lurye were subpoenaed for trial testimony.  See Subpoena of Lee Saunders [Dkt. No. 6-1]; Subpoena of William Lurye [Dkt. No. 6-2].

II.   LEGAL FRAMEWORK

Under Rule 45 of the Federal Rules of Civil Procedure, a court "must quash or modify a subpoena that . . . subjects a person to undue burden."  FED. R. CIV. P. 45(d)(3)(A)(iv).  Rule 45 applies to "both document and testimonial subpoenas," including subpoenas to third-party witnesses called to testify at trial.  See BuzzFeed, Inc. v. U.S. Dep't of Justice, 318 F. Supp. 3d 347, 356 (D.D.C. 2018) (citing Watts v. S.E.C., 482 F.3d 501, 508 (D.C. Cir. 2007)).

5

The D.C. Circuit has "admonished district courts to be 'generally sensitive to the costs imposed on third parties' when considering a motion to . . . quash[] pursuant to Rule 45, reminding [courts] to consider 'whether the discovery sought is obtainable from some other source that is more convenient, less burdensome, or less expensive." Millennium TGA, Inc. v. Comcast Cable Commc'ns LLC, 286 F.R.D. 8, 11 (D.D.C. 2012) (quoting Watts v. S.E.C., 482 F.3d at 508). The burden of proving undue burden lies with the party moving to quash. See Payne v. District of Columbia, Civ. No. 10-0679, 2016 WL 10703795, at *3 (D.D.C. Nov. 14, 2016).

Courts evaluate motions to quash by weighing the competing interests involved in enforcing the subpoena, which derive in part from the discovery requirements under Rule 26 of the Federal Rules of Civil Procedure. See 9A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2463.1 (3d ed. 2022); see also Stati v. Republic of Kazakhstan, Civ. No. 14-1638, 2020 WL 3259244, at *4 (D.D.C. June 5, 2020) ("The undue burden standard for Rule 45 also mirrors the standard included within Rule 26."). Rule 26(b) requires district courts "'to consider a number of factors potentially relevant to the question of undue burden.'" BuzzFeed, Inc. v. U.S. Dep't of Justice, 318 F. Supp. 3d at 358 (quoting Watts v. S.E.C., 482 F.3d 509). Those factors include:

> (1) whether the discovery sought is "unreasonably cumulative or duplicative"; (2) whether the discovery sought "can be obtained from some other source that is more convenient, less burdensome, or less expensive"; and (3) whether the discovery sought is "proportional to the needs of the case." taking into account "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit."

Id. (quoting FED. R. CIV. P. 26(b)(1), (2)(C)). Courts "must balance the interests served by demanding compliance with the subpoena against the interests furthered by quashing it." Dell Inc. v. DeCosta, 233 F. Supp. 3d 1, 3 (D.D.C. 2017) (internal quotations and citations omitted).

### III.   DISCUSSION

AFSCME moves the Court to quash the subpoenas issued to Lee Saunders and William Lurye because "compliance would cause an undue burden not justified by the value of the proposed testimony." Pet'r Mot. at 4. To start, petitioner maintains that the burden on AFSCME and the individual witnesses is "substantial." Id. at 5. According to AFSCME, Mr. Saunders and Mr. Lurye serve high-ranking leadership positions in the organization, "perform absolutely unique and essential roles within AFSCME, and pulling them away from their substantial duties to AFSCME and its members places an undeniable burden on the union." Id. at 6.[3] Petitioner also suggests that the subpoenas are "calculated" to harass the witnesses and will "risk[] allowing Defendants to try to use this Court as a platform to advance their ideological goals." Id. at 2, 11. Petitioner further states that "[t]he week set aside for this trial is a particularly busy time for them, as there is a long-scheduled meeting of the AFSCME International Executive Board [("IEB")] [] on Tuesday, September 20, which will require the day of September 19 for preparation, as well as the attention of both men in the week prior." Id. at 10.

---

[3] Petitioner urges the Court to apply the "apex doctrine" in analyzing these subpoenas, under which courts require parties to "demonstrate 'extraordinary circumstances'" in attempting to depose high-ranking government officials. Pet'r Mot. at 6 (quoting United States v. Newman, 531 F. Supp. 3d 181, 188 (D.D.C. 2021)). Petitioner concedes, however, that no judge in this district has extended the apex doctrine to non-government executives. See id. Because the Court need not apply the apex doctrine to resolve this motion, it declines to discuss its application in this opinion.

7

AFSCME further argues that "the evidentiary interest" in Mr. Saunders' and Mr. Lurye's testimony "is, at best, negligible" for three reasons. Pet'r Mot. at 6. First, AFSCME asserts that Mr. Frey – who is already scheduled to give testimony at trial – is "best situated" to testify because "the relationships at issue were under his authority." Id. at 7. Second, AFSCME maintains that Mr. Saunders "has no independent knowledge of any disputed facts" and therefore "any non-hearsay testimony he could offer would be minimal and cumulative to the testimony already offered by Mr. Frey." Id. at 8. And third, petitioner contends that Mr. Lurye "has no unique or additional facts to add" and that his testimony is cumulative and "can be garnered from other witnesses." Id. at 9. Petitioner adds that because neither individual preserved their testimony through depositions, "it is extremely unlikely that either individual will have sufficient memory of events that occurred six years prior." Id.

Project Veritas, in contrast, argues that Mr. Saunders and Mr. Lurye do indeed "have valuable testimony to offer." Resp't Opp. at 8. For example, Project Veritas points to evidence in the record that Mr. Lurye and Mr. Saunders independently discussed the decision to terminate the contract with Strategic Consulting outside the presence of Mr. Frey. See id. at 9 (citing Frey Dep. at 67:12-22). Project Veritas also emphasizes the fact that "Mr. Saunders was the actual decision-maker at AFSCME" and argues that "[a] jury should hear the thinking of Messrs. Frey, Lurye and Saunders, respectively, and the reasoning behind Mr. Saunders's ultimate decision in order to further develop the testimony of [Mr. Frey] so that the jurors can fully understand AFSCME's motivations." Id. at 9, 10-11. Project Veritas further rejects petitioner's argument that the subpoenas impose an undue burden, asserting that "to travel two miles to the Court from AFSCME's headquarters for one morning in September is not burdensome," and the testimony sought "poses no risk of harassment." Resp't Opp. at 12.

The Court has carefully weighed the competing interests involved in enforcing the subpoenas of Mr. Saunders and Mr. Lurye. To start, the Court finds no evidence that either subpoena in this action is "calculated" to harass the witnesses or advance respondents' ideological goals. See Pet'r Mot. at 2, 11. The testimony sought is clearly relevant to the underlying litigation – plaintiffs must persuade the jury at trial that "defendants' non-expressive conduct was a substantial factor in the decision[] by AFSCME . . . to terminate [its] contracts with Strategic Consulting." Democracy Partners III, 453 F. Supp. 3d at 275. AFSCME executives involved in the contract termination are therefore likely to offer testimony that "has [a] tendency to make [this] fact more or less probable . . . [and] the fact is of consequence in determining the action." FED. R. EVID. 401. Moreover, respondents correctly assert that at trial, "[o]bjections to irrelevant or harassing inquiries of Messrs. Saunders and Lurye would be sustained[,] [and] AFSCME does not . . . point to an inappropriate inquiry in Mr. Frey's 30(b)(6) deposition." Resp't Opp. at 12 n.5.

For the following additional reasons, the Court concludes that AFSCME has not met its burden in demonstrating that the subpoena for trial testimony of Mr. Lurye imposes an undue burden or that it would be cumulative. AFSCME has, on the other hand, met its burden regarding the subpoena for trial testimony of Mr. Saunders. The Court considers the two subpoenas in turn.

### A. William Lurye

The Court first concludes that the burden of enforcing Mr. Lurye's subpoena is not substantial. Defendants are correct that the AFSCME headquarters are close in proximity to the courthouse, which cuts against the burden of appearing at trial. See Resp't Opp. at 12. The Court and the parties can further mitigate this burden by scheduling Mr. Lurye's testimony for a

9

specific date and time that best accommodates his preexisting commitments.  And as chief of staff and counsel, Mr. Lurye does not hold the same degree of leadership in the union and the IEB as AFSCME's president, Mr. Saunders.

The subpoena for Mr. Lurye's trial testimony also does not seek "unreasonably cumulative or duplicative" information.  FED. R. CIV. P. 26(b)(2)(C)(i); see BuzzFeed, Inc. v. U.S. Dep't of Justice, 318 F. Supp. 3d at 358.  Mr. Lurye has direct knowledge of a major issue at trial – namely, whether "defendants' non-expressive conduct was a substantial factor in the decisions by AFSCME and AUFC to terminate their contracts with Strategic Consulting." Democracy Partners III, 453 F. Supp. 3d at 275.  In fact, AFSCME concedes that the decision to terminate its contract with Strategic Consulting was reached through mutual agreement during a conversation between Mr. Frey and Mr. Lurye.  See Pet'r Mot. at 3; see also Frey Dep. at 75:1-7. Mr. Lurye's testimony will either corroborate Mr. Frey's or contradict it.

Moreover, the full scope of Mr. Lurye's testimony cannot "be obtained from some other source that is more convenient, less burdensome, or less expensive." FED. R. CIV. P. 26(b)(2)(C)(i); see BuzzFeed, Inc. v. U.S. Dep't of Justice, 318 F. Supp. 3d at 358.  Mr. Frey and Mr. Lurye independently considered the circumstances in reaching the decision to terminate AFSCME's contract with Strategic Consulting, and these considerations go directly to the heart of whether Project Veritas' "non-expressive conduct" was a substantial factor in AFSCME's decision.  Democracy Partners III, 453 F. Supp. 3d at 275.  No one can state with certainty that "Mr. Frey is able to fully explain [AFSCME's] decision."  Reply in Support of Non-Party Motion to Quash Subpoenas for Trial Testimony of AFSCME President Lee Saunders and Chief of Staff/Counsel William Lurye ("Pet'r Reply") [Dkt. No. 8] at 2-3.  And contrary to petitioner's assertion, there may be gaps in Mr. Frey's testimony that Mr. Lurye may be able to fill.  See id. at 5-6.  For example, the record is clear that Mr. Lurye and Mr. Saunders had at least one

"independent discussion[]" regarding the contract termination to which Mr. Frey was not privy. Resp't Opp. at 8-9; see also Frey Dep. at 67:12-22.

Lastly, plaintiffs have pled damages in excess of one million dollars based on the loss of their contracts with AFSCME and AUFC.  See Democracy Partners III, 453 F. Supp. 3d at 274.  To avoid "raising any First Amendment concerns," plaintiffs must prove that such damages were "proximately caused by defendants' non-expressive conduct" in order to recover from defendants.  Id.  The testimony from Mr. Lurye may therefore be crucial to the jury's determination at trial.

### B.  Lee Saunders

Mr. Saunders' subpoena involves a different calculus.  To start, the Court believes that AFSCME has demonstrated that the subpoena of Mr. Saunders places some substantial burden on the organization, particularly during two of the five days scheduled for trial.  Mr. Saunders, as president of the union, serves the highest leadership position in the organization, which represents 1.4 million members.  See Pet'r Mot. at 4; see also Pet'r Reply at 2 (describing AFSCME as "the largest union of public service employees in the United States").  Mr. Saunders also serves as Chair of the AFSCME [IEB], which has an in-person meeting during two of the days allotted for trial.  See Pet'r Mot. at 10; Pet'r Reply at 2 n.1.  AFSCME proffers that the IEB is the "the highest legislative and policy-making body of th[e] Federation outside of the quadrennial Convention."  Pet'r Reply at 2 n.1 (internal quotation omitted).

Furthermore, the Court agrees with petitioner that "the evidentiary interest" in Mr. Saunders' testimony "is, at best, negligible."  Pet'r Mot. at 6.  In fact, the description of Mr. Saunders' testimony submitted in defendants' proposed witness list includes only one topic that is not listed under the descriptions of testimony for Mr. Frey and Mr. Lurye – namely, "[Mr.

11

Saunders'] departure from the board of Americans United for Change." See JPS at 16-17. But Mr. Saunders' personal decision to step down from the board of AUFC is not at issue. Rather, as discussed above, plaintiffs need only prove that "defendants' non-expressive conduct was a substantial factor in the decisions by AFSCME and AUFC to terminate their contracts with Strategic Consulting." Democracy Partners III, 453 F. Supp. 3d at 275. Although it is true that Mr. Saunders had final decision-making authority as president of the union, there is no evidence that he engaged in any material or substantive consideration of the decision to terminate the contract apart from his approval of the determination made by Mr. Lurye and Mr. Frey. Mr. Frey and Mr. Lurye "reasoned through the recommendation, regardless of whether it was formally 'approved' by President Saunders." Pet'r Reply at 3. The factual dispute at trial "involves only the reason for the decision—and not the ultimate fact of the decision." Id.

Project Veritas argues that Mr. Saunders has valuable testimony to offer because he had an "independent discussion[]" with Mr. Lurye. See Resp't Opp. at 8. Project Veritas includes the following exchange from Mr. Frey's deposition, in which he describes the events that ensued after he spoke with Brad Woodhouse, the head of AUFC, and Robert Creamer, the owner of Strategic Consulting:

> Q. . . . In addition to meeting with the chief of staff, did you report what you learned to the president of AFSCME?
>
> A. Not immediately, no.
>
> Q. Just as a matter of, why not?
>
> A. I felt like I had conveyed this to the chief of staff and that he would do that. I think some time lapsed. I don't recall whether he was out of the office or on travel. I don't recall specifically. In hindsight I felt that, you know, my notifying the chief of staff closed that loop.

12

Id. at 9 (quoting Frey Dep. at 67:12-22).  Contrary to Project Veritas' assertions, however, this exchange provides no support for the position that Mr. Saunders will have anything important to say at trial.  Instead, it makes clear that whatever Mr. Frey "learned" from his conversations with Mr. Woodhouse and Mr. Creamer was "conveyed to the chief of staff," Mr. Lurye, who in turn reported it to Mr. Saunders.  Id.  Any relevant information from this "independent discussion[]" may be elicited at trial through the testimony of Mr. Frey and Mr. Lurye.  See id.  Mr. Saunders' testimony will therefore be "cumulative [and] duplicative" of the other two AFSCME witnesses. FED. R. CIV. P. 26(b)(2)(C)(i).

While it is true that the question of why AFSCME terminated its contract is a substantial issue, Mr. Saunders is plainly not needed to aid the jury in answering this question. See Democracy Partners III, 453 F. Supp. 3d at 275.  The burden of requiring Mr. Saunders' testimony therefore "outweighs its likely benefit."  Watts v. S.E.C., 482 F.3d at 508.

## IV.   CONCLUSION

After carefully weighing the competing interests involved in enforcing the subpoenas at issue, the Court entered an Order on August 21, 2022 quashing the subpoena of Lee Saunders and enforcing the subpoena of William Lurye for trial testimony in the case of Democracy Partners v. Project Veritas Action Fund, Civ. No. 17-1047.  See Minute Order (Aug. 21, 2022).  This Opinion explains the reasoning underlying that Order.

SO ORDERED.

_____
PAUL L. FRIEDMAN
United States District Judge

DATE:  August 25, 2022